2020 IL App (1st) 171331-U

No. 1-17-1331

Order filed July 31, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 11443 |
| | ) | |
| JERYME MORGAN, | ) | Honorable |
| | ) | Marc W. Martin, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the second-stage dismissal of defendant's *pro se* petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)), as the record does not support defendant's claim that his postconviction counsel rendered unreasonable assistance by failing to amend his petition.

¶ 2    Following a 2009 jury trial, defendant Jeryme Morgan was found guilty of three counts of aggravated criminal sexual assault, as well as one count each of kidnapping and robbery. The trial court sentenced him to an aggregate term of 52 years' imprisonment: three consecutive 15-year

terms on the aggravated criminal sexual assault counts, a consecutive seven-year term on the robbery conviction, and a concurrent seven-year term for kidnapping. On direct appeal, this court modified the assessment of certain fines and fees imposed by the trial court, but affirmed the judgment in all other respects. *People v. Morgan*, 2012 IL App (1st) 093388-U.

¶ 3 On December 6, 2013, defendant filed a *pro se* postconviction petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). The circuit court advanced the petition to the second stage of postconviction proceedings and appointed counsel. The trial court granted the State's subsequent motion to dismiss the petition. Defendant appeals, arguing that he was denied reasonable assistance of postconviction counsel. For the following reasons, we affirm.

¶ 4 We recount the facts here to the extent necessary to resolve the issue raised on appeal.

¶ 5 The record shows that defendant was indicted on 59 counts arising from a 2007 sexual assault against M.H. In 2009, defendant was tried on three counts of aggravated criminal sexual assault, one count of robbery, and one count of kidnapping. The remaining counts were nol-prossed.

¶ 6 Before trial, defense counsel filed a "Motion for Evidentiary Hearing on the Reliability of Forensic Y-Marker DNA Evidence," challenging the admissibility of Y-STR DNA testing that had been performed on swabs from M.H.[1] In the motion, defense counsel stated that "[u]nlike autosomal DNA analysis, Y-Marker DNA analysis is a new, novel and less frequently used form of forensic analysis." The State filed an opposition to that motion but later informed the court at a

___

[1] Y-STR refers to "short tandem repeat" analysis "derived solely from the male sex[-]determining Y chromosome." See U.S. Department of Justice, Nat. Institute of Justice, *What Is STR Analysis?* (March 2, 2011) available at https://nij.ojp.gov/topics/articles/what-str-analysis.

pre-trial hearing that it would not introduce Y-STR testing evidence and would "proceed on the autosomal DNA."

¶ 7    At trial, M.H. testified that on the night of April 20, 2007, she went to a bar with friends and then went to her boyfriend's home. About 3 a.m., she drove alone to the parking lot of her apartment complex. As she was walking from her car, a man she identified as defendant placed his arm around her neck, placed a gun to her head, and pulled her into a sport utility vehicle (SUV). In the back seat of the SUV, defendant sexually assaulted M.H., vaginally and anally. She struggled and attempted to escape, but defendant hit her on the head with the gun, causing her to bleed. At one point, defendant bit M.H. in the neck. Defendant then forced her to perform oral sex on him.

¶ 8    Defendant subsequently demanded M.H.'s credit cards, ATM card, and keys. He drove with M.H. to an ATM, where he withdrew money from her account. Before he let her go, defendant took her cell phone. M.H. ran to a store and police were contacted. M.H. was taken to a hospital, where a sexual assault kit was collected.

¶ 9    M.H. told police that the attacker was a black male about five foot seven inches tall, with a "corn rows" hairstyle, and that he drove a dark-colored SUV. On May 1, 2007, M.H. identified defendant in a physical lineup.

¶ 10    Janice Grams, a registered nurse, testified that she examined M.H. after she arrived at the hospital. Grams collected a sexual assault kit from M.H., which included vaginal swabs and a swab of the bite mark on her neck.

¶ 11    A number of police officers testified about the investigation leading to defendant's arrest and the subsequent collection of evidence, including a buccal swab from defendant and swabs from his vehicle.

¶ 12    The State introduced evidence of other crimes through the testimony of Maricel Marcial and Monica Solek, who described an incident on the night of April 30, 2007. Marcial testified that she drove into her condominium's parking garage and parked next to Solek, her neighbor. As Marcial exited her car, she was approached by defendant, who pointed a gun at her head and "dragged [her] by the hair" to the ground. After defendant looked at Solek, he asked Marcial to open the garage door and then drove away. Marcial described her assailant and his SUV to police. The next day, she identified defendant in a physical line-up. Solek similarly testified that she saw an armed black male with corn rows assault Marcial in the parking garage, although Solek did not identify defendant.

¶ 13    Blake Aper, a forensic scientist with Illinois State Police, testified as an expert witness regarding autosomal DNA analysis. Aper explained that in autosomal analysis, "we type at 13 different locations to determine someone's DNA profile." Aper testified that a blood sample from a stain in the back seat of defendant's vehicle showed a mixed profile, with a female as the major contributor and a small trace amount of a male profile. Aper determined that 11 of the 13 loci from the sample matched M.H.'s DNA profile, and that M.H. could not be excluded from having contributed the female DNA in that sample. The State asked Aper if he could "make a statistical analysis with respect to what that means as far as the general population and who could possibly be excluded under those circumstances?" Aper answered that "[a]pproximately in 200 trillion black, one in 2.9 trillion white, or one in five trillion Hispanic unrelated individuals could not be excluded" from having contributed to the sample.

¶ 14    Defense counsel asked Aper to explain the source of the "statistical expressions" that he had provided. Aper testified that "these are the same numbers that the FBI [Federal Bureau of

Investigation] uses for their statistical calculator. So what they did was they sampled a number, a couple hundred people in the population, and typed them to determine the frequencies that the types occur in the population."

¶ 15    The jury found defendant guilty of all three counts of aggravated criminal sexual assault, as well as one count each of kidnapping and robbery. The trial court sentenced him to an aggregate term of 52 years' imprisonment. On direct appeal, this court modified the assessment of certain fines and fees, but affirmed the judgment in all other respects. *People v. Morgan*, 2012 IL App (1st) 093388-U.

¶ 16    On December 6, 2013, defendant filed a *pro se* postconviction petition under the Act. Defendant alleged, *inter alia*, that he was denied effective assistance of trial counsel because counsel "failed to properly investigate exculpatory DNA evidence." He claimed that his counsel failed to "obtain[] DNA experts or an experience[d] attorney for the DNA evidence" despite being aware of the "need to consult and conduct independent tests" on such evidence. Defendant also claimed that the State "committed [a] *Brady* violation" by "failing to timely turn over all of the exculpatory DNA evidence."

¶ 17    On March 21, 2014, postconviction counsel was appointed to represent defendant. At a status hearing on April 15, 2016, postconviction counsel informed the court that she was in the process of "reading the appellate record investigating his claim regarding the DNA evidence that was introduced." Counsel remarked that "there was some complex science involved" and she was "looking at the current reliability of what was entered into evidence." The following exchange ensued:

"THE COURT: Is this a *pro se* PC?

[COUNSEL]: It's a *pro se*, your Honor. So I have to determine whether I am going to amend it based on some of the current practices in the forensic DNA community. The FBI released a couple months ago that their CPI [combined probability of inclusion] statistics were flawed and so it has an impact on the number of cases involving DNA. So there is a consultant * * * that I am going to have to refer to because the FBI sent out a notice to all the district attorneys.

I am a member of the American Academy of Science. I received the notice so it has now become somewhat of a complicated issue as to what the legal significance is on the statistical models that the FBI was using at the time and now is saying that there were problems with it that might have a legal impact on the rarity of the genotype frequencies.

THE COURT: So was there a number that was entered into evidence in this case?

[COUNSEL]: Your Honor, in terms of what the genetic frequencies, I don't have that on top of my head. * * *

THE COURT: Does the flaw relate to the number being different?

[COUNSEL]: Yes. Yes.

THE COURT: So instead of the possibility 1 out of whatever 23 million, it's 1 out of 19 million or something like that.

[COUNSEL]: In one documented case, it went from 1 [in] a billion down to 1 [in] 3500. This is what has been published at the American Academy of Science."

Counsel further informed the court that a panel of experts indicated "that the utilization of this could radically change the statistics that were offered at trial." Counsel remarked that "this probalistic [*sic*] genotype could have a major impact both on potential new indications but [also] old PC [postconviction] cases." At the conclusion of the status hearing, the court stated: "Let's set this for July 22nd for filing of supplemental."

¶ 18    At the July 22, 2016 hearing, postconviction counsel informed the court that she was still "examining the trial file" and conducting "outside investigation beyond the record." The court set a September 30, 2016 deadline "for filing of a [Rule] 651 certificate."

¶ 19    On September 29, 2016, postconviction counsel filed a Rule 651(c) certificate, in which she attested that she had consulted with defendant, examined the trial proceedings and the files of defendant's trial counsel, including "all forensic DNA reports." Counsel specifically described an Illinois State Police Forensic Science Laboratory report "that was not introduced at trial by the State," which described "Y-STR testing results" from swabs of M.H.'s vagina and neck. As detailed in the certificate, the results from the vaginal swabs were not conclusive.[2] However, the report suggested a high likelihood that the neck swab matched defendant's DNA. In the certificate, counsel related to the court:

> "According to the report, the Y-STR haplotype results identified from the swab of
>
> M.H.'s neck * * * were interpreted as a mixture of DNA from two males. A major

---

[2] The certificate states that: "According to the report, a major Y-STR haplotype was identified in the non-sperm fraction of the vaginal swab 'which does not match the Y-STR haplotype of Jeryme Morgan,' and an additional minor Y-STR haplotype were identified at two loci from which 'Jeryme Morgan can be excluded.' " Further, "a major Y-STR haplotype was identified in the mixed fraction of the vaginal swab * * * which was interpreted as a mixture of DNA from three males. One major Y-STR haplotype was identified which does not match the Y-STR haplotype of Jeryme Morgan; and an additional minor Y-STR haplotype were identified at one locus from which 'Jeryme Morgan cannot be excluded.'"

Y-STR haplotype was identified 'which matches the Y-STR haplotype of Jeryme Morgan.' The report indicated the frequency of the match as follows: 'With a 95% upper confidence limit, this haplotype would be expected to occur in approximately 1 in 370 unrelated Black males, 1 in 290 unrelated Hispanic males, and 1 in 430 unrelated White males based on a database of 1108 Blacks, 894 Hispanics, and 1311 Whites.' "

¶ 20     The Rule 651(c) certificate also stated that counsel had "examined the non-testifying defense witness retained to review the DNA." After investigation, counsel determined she was "unable to supplement the *pro se* petition with affidavits, or independent scientific evidence." Counsel concluded that defendant's *pro se* petition "adequately presents his claims of deprivations of constitutional rights" and that amendment was unnecessary.

¶ 21     In February 2017, the State filed a motion to dismiss the petition. On April 12, 2017, the court heard argument on that motion. At the hearing, postconviction counsel indicated that she included the Y-STR testing results in her Rule 651(c) certificate to explain that defendant's claim of ineffective assistance of trial counsel lacked merit, to the extent defendant suggested that the Y-STR testing was exculpatory evidence. Counsel stated that, as an "officer of the court" she "felt obligated to tell the Court what the DNA results were."

¶ 22     On May 19, 2017, the court granted the State's motion and dismissed the petition. On May 24, 2017, defendant filed a notice of appeal.

¶ 23     On appeal, defendant raises a single contention: that he was denied reasonable assistance of postconviction counsel, due to counsel's failure to amend the petition to reflect the "flawed" FBI statistics discussed at the April 2016 status hearing.

¶ 24    The Act sets forth a procedure under which a criminal defendant may assert his or her conviction was the result of a substantial denial of his or her rights under the United States Constitution, the Illinois Constitution, or both. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act contemplates a three-stage proceeding, which is initiated by the filing of a petition. *People v. Johnson*, 2018 IL 122227, ¶ 14; 725 ILCS 5/122-1(b) (West 2016). The petition must "clearly set forth the respects in which [the defendant's] constitutional rights were violated." 725 ILCS 5/122-2 (West 2016). The defendant must attach affidavits, records, or other evidence to support his or her allegations or shall state why the same is not attached, but the petition need not contain argument or citation and discussion of pertinent authority. *Id.*

¶ 25    During the first stage, the circuit court must independently evaluate the petition and determine whether it meets the low standard of pleading sufficient facts to state an arguably constitutional claim. *Hodges*, 234 Ill. 2d at 9-10. The court may dismiss the petition only if it is frivolous and patently without merit. *Id.* at 10. A petition is frivolous and patently without merit when it is based on an indisputably meritless legal theory or a fanciful factual allegation. *Id.* at 16. "[A]n indisputably meritless legal theory is one which is completely contradicted by the record," and "[f]anciful factual allegations include those which are fantastic or delusional." *Id.* at 16-17.

¶ 26    If the court does not dismiss the petition within 90 days, the matter is advanced to the second stage at which the court may appoint counsel to represent defendant, and the State may either move to dismiss or answer the petition. *Johnson*, 2018 IL 122227, ¶¶ 14-15. At the second stage, the court must determine whether the petition and accompanying documentation sets forth a substantial showing of a constitutional violation. *Id.* ¶ 15. If no such showing is made, the petition is dismissed. *Id.*

¶ 27    In this court, defendant does not challenge the dismissal of his petition on the merits. Rather, he requests that we remand his case to the circuit court for further proceedings because his postconviction counsel provided unreasonable assistance in failing to amend the *pro se* petition. Specifically, he argues that postconviction counsel could have "bolstered" the *pro se* petition's claim that trial counsel failed to adequately investigate or challenge the DNA evidence, by attacking the FBI statistics underlying Aper's testimony. Defendant points out that Aper did not testify to an exact match between M.H.'s DNA and the sample from defendant's SUV, but that 11 out of 13 loci matched. Thus, Aper "merely" testified that M.H. could not be excluded as the major contributor to the sample. Defendant argues that "the State was able to overcome this deficiency" by asking Aper about the FBI's statistics on the probability of an 11-loci match, leading to Aper's testimony that only one in 2.9 trillion white individuals could not be excluded. Defendant argues that these statistics "conveyed to the jury that it was virtually impossible" that anyone but M.H. contributed to that sample.

¶ 28    Defendant points out that, in May 2015, the FBI acknowledged errors in data used to calculate the likelihood of a match between a DNA sample and a particular individual. Defendant's brief cites a number of sources indicating that the likelihood of a match in the general population is much greater than FBI statistics previously suggested. He claims that postconviction counsel could have amended the *pro se* petition's ineffectiveness of trial counsel claim to argue "that it was possible for trial counsel to challenge the FBI's population statistics at the time of trial."

¶ 29    Defendant emphasizes that, at the April 2016 status hearing, postconviction counsel "verbally advised the circuit court that the FBI's statistical models exaggerated the rarity of genotype frequencies in the general population." He faults counsel for not raising the issue again,

"even though it would have bolstered [defendant's] *pro se* claim that the DNA evidence at trial was not adequately challenged" by his trial counsel. Defendant thus claims that counsel's Rule 651 certificate "conflicted with her prior assertions" at the April 2016 hearing, and that she failed to explain "why she abandoned the meritorious issue." He claims that her "inconsistent" action in failing to amend the *pro se* petition to reflect this issue constitutes unreasonable assistance, as there is "no reasonable explanation for why counsel abandoned her original proposed and meritorious DNA claim." He also suggests it was improper for counsel's Rule 651(c) certificate to reference the Y-STR testing results, which was "completely unnecessary and only served to harm her client's interests." On this basis, defendant asks that we remand this case for the appointment of counsel and further second-stage proceedings.

¶ 30    We initially note that by focusing exclusively on the issue of postconviction counsel's reasonableness, defendant has forfeited for review any substantive claim challenging the dismissal of the petition on the merits. *People v. Cotto*, 2016 IL 119006, ¶ 49.

¶ 31    When a postconviction petition is dismissed without an evidentiary hearing, the standard of review is *de novo. People v. Suarez*, 224 Ill. 2d 37, 42 (2007) (citing *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998)).

¶ 32    "There is no constitutional right to the assistance of counsel in postconviction proceedings; the right to counsel is wholly statutory [citation] and petitioners are only entitled to the level of assistance provided for by the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2000))." *Suarez*, 224 Ill. 2d at 42. "The Act provides for a reasonable level of assistance." *Id.* (citing *People v. Flores*, 153 Ill. 2d 264, 276 (1992)).

¶ 33    Illinois Supreme Court Rule 651(c) "imposes specific duties on postconviction counsel to ensure that counsel provides that reasonable level of assistance." *People v. Kirk*, 2012 IL App (1st) 101606, ¶ 18. "The rule requires that postconviction counsel consult with the defendant to ascertain his contentions of the deprivation of constitutional rights, examine the record of the proceedings at trial, and make any amendments to the defendant's *pro se* petition that are necessary for an adequate presentation of his contentions." *Id.* (citing Ill. S. Ct. R. 651(c) (eff. Dec. 1, 1984)).

¶ 34    Furthermore, "postconviction counsel is not required to amend a defendant's *pro se* postconviction petition [citation] but, rather is only required to investigate and present the defendant's claims [citation.]" *Kirk*, 2012 IL App (1st) 101606, ¶ 21. That is, although postconviction counsel "*may* conduct a broader examination of the record [citation] and may raise additional issues" that were not raised in the *pro se* petition, "there is no obligation to do so." (Emphasis in original.) *People v. Pendleton*, 223 Ill.2d 458, 476 (2006).

¶ 35    "Compliance with Rule 651(c) may be shown by the filing of a certificate representing that counsel has fulfilled her duties." *Kirk*, 2012 IL App (1st) 101606, ¶ 19 (citing *People v. Perkins*, 229 Ill.2d 34, 50 (2007)). "The filing of the certificate gives rise to the presumption that the defendant received the required representation during second-stage proceedings [citations]; however, this presumption may be rebutted by the record [citation.]." *Id.* "It is defendant's burden to overcome this presumption by demonstrating his attorney's failure to substantially comply with the duties mandated by Rule 651(c)." *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19.

¶ 36    In this case, there is no dispute that postconviction counsel filed a Rule 651(c) certificate indicating that that she consulted with defendant, investigated the claims in his *pro se* petition, and determined that it was unnecessary to make amendments to adequately present his contentions.

Defendant acknowledges that, in turn, there is a presumption that counsel satisfied her statutory duty to provide reasonable level of assistance. However, defendant contends that the record rebuts that presumption; he relies on the purported inconsistency between counsel's comments at the April 2016 status hearing regarding FBI statistics, and her "failure to follow through" by declining to amend the postconviction petition to discuss that subject. Defendant recognizes that postconviction counsel ordinarily has no obligation to amend a *pro se* petition. However, he asserts "this rule no longer applies when counsel verbally argues an issue but fails to amend the petition to include it," citing our decision in *Kirk*, 2012 IL App (1st) 101606.

¶ 37 After carefully reviewing the record at bar, we find that defendant has failed to overcome the presumption that postconviction counsel provided reasonable assistance during second-stage proceedings. Indeed, the record reflects counsel's diligent, thorough investigation. The record shows that counsel reviewed defendant's petition; communicated with defendant to ascertain his claims; reviewed the record of the proceedings at trial; reviewed the files of defendant's trial counsel; examined reports regarding DNA evidence (including those not introduced at trial); and conducted additional outside investigation, including with respect to the FBI statistical issue brought to the court's attention at the April 2016 hearing. The record also shows that on multiple court dates, counsel apprised the court of the progress of her investigation and requested additional time to complete it. Given this record, defendant has not met his burden to rebut the presumption that postconviction counsel provided reasonable assistance and satisfied her duties under Rule 651(c).

¶ 38 In reaching this conclusion, we reject defendant's reliance on *Kirk* for the proposition that postconviction counsel's failure to amend the petition constituted unreasonable assistance. First,

*Kirk* is plainly distinguishable. Moreover, contrary to defendant's argument, the record makes clear that postconviction counsel did not "fail to follow through" on an issue she had previously asserted as meritorious. Rather, the record reflects counsel investigated a potential issue, before determining that amendment was not appropriate.

¶ 39 In *Kirk*, defendant was convicted of aggravated battery, after testifying at trial that he shot the victim in self-defense. 2012 IL App (1st) 101606, ¶ 6. Defendant filed an unsuccessful posttrial motion alleging, *inter alia*, the trial court erred in not permitting certain "*Lynch* evidence" regarding the victim's violent nature. *Id*.; see *People v. Lynch*, 104 Ill.2d 194, 200 (1984) (when self-defense is raised, defendant may present appropriate evidence of victim's aggressive and violent character). After his unsuccessful direct appeal, defendant filed a *pro se* petition alleging that trial counsel was ineffective, suggesting that other witnesses could have testified to the victim's violent behavior. *Kirk*, 2012 IL App (1st) 101606, ¶ 7. The first assistant public defender who served as postconviction counsel filed a Rule 651(c) certificate, stating that she examined the *pro se* petition and, " 'as it adequately presents his issues, a supplemental petition will not be presented.' " *Id.* ¶ 10. A second assistant public defender subsequently took over as postconviction counsel, and the State moved to dismiss the petition. *Id.* ¶ 11. At the hearing on the motion, postconviction counsel asserted (for the first time) that defendant's appellate counsel rendered ineffective assistance by failing to argue that the trial court erred in precluding additional *Lynch* evidence. *Id.* ¶ 13. Postconviction counsel stated that he believed that " 'this [issue] has merit to it.' " *Id.*

¶ 40 On appeal from the dismissal of the petition, this court concluded that "postconviction counsel rendered unreasonable assistance by failing to amend the defendant's *pro se*

postconviction petition to include the claim of ineffective assistance of appellate counsel raised at the hearing on the State's motion to dismiss." *Id.* ¶ 36. Although we recognized the presumption arising from counsel's filing of a Rule 651(c) certificate, we found that "counsel did not comply with the duties imposed by Rule 651(c)" where counsel "effectively admitted to the court that the defendant's 'main claim' included ineffective assistance of appellate counsel, but failed to include that claim in the petition." *Id.* ¶ 31 (quoting *People v. Schlosser*, 2012 IL App (1st) 092523, ¶ 28)). We thus reversed and remanded, directing the trial court to conduct further proceedings after allowing defendant leave to amend his postconviction petition. *Id.* ¶ 36.

¶ 41    The facts of this case do not resemble the situation in *Kirk*. In *Kirk*, postconviction counsel attempted to raise a new claim for the first time at oral argument on the State's motion to dismiss, long after the filing of a Rule 651(c) certificate. In contrast, defendant in this case premises his ineffectiveness claim on postconviction counsel's comments about FBI statistics at a status conference, months *before* the filing of the Rule 651(c) certificate or the State's motion to dismiss. Thus, *Kirk* is procedurally distinguishable.

¶ 42    Moreover, defendant mischaracterizes his counsel's comments at the April 2016 hearing. Defendant suggests that postconviction counsel "initially asserted [at the hearing] that the FBI's admission of error in its DNA population statistics would impact [defendant's] case." However, the transcript of the April 15, 2016 status hearing makes apparent that postconviction counsel, in the course of requesting more time to determine whether she would amend the *pro se* petition, merely identified the topic of flawed FBI statistics as a potential issue that she was investigating. Postconviction counsel did not represent that this was a meritorious issue, but commented that it was "somewhat of a complicated issue as to what the legal significance is o[f] the statistical models

that the FBI was using at the time." Indeed, counsel explicitly told the court that she had not yet "determine[d] whether I am going to amend" the *pro se* petition. This bears no resemblance to *Kirk*, where "counsel specifically represented that his oral claim of ineffective assistance of appellate counsel had merit." *Id.* ¶ 35. Contrary to defendant's suggestion that postconviction counsel asserted an issue but then "abandoned" it, there is no conflict between counsel's comments at the status hearing and her eventual decision not to amend the *pro se* petition.

¶ 43    We likewise reject defendant's suggestion that postconviction counsel's decision to include the Y-STR data in her Rule 651(c) petition rebuts the presumption that she provided reasonable assistance. First, we agree with the State that there is nothing in the record to indicate that her decision to include the Y-STR data had any relationship to her decision not to amend the petition with respect to the FBI statistics. Rather, the record indicates that postconviction counsel included the Y-STR DNA results in her Rule 651(c) certificate to demonstrate that she had thoroughly investigated a potential amendment to defendant's *pro se* petition, to the extent it claimed that trial counsel ignored exculpatory DNA evidence, before concluding that amendment was not appropriate.

¶ 44    In short, defendant has not met his burden to rebut the presumption that postconviction counsel provided reasonable assistance and satisfied her duties under Rule 651(c). Rather, the record reflects that postconviction counsel conducted a thorough investigation before determining that defendant's *pro se* petition adequately presented his claims. As defendant cannot meet his burden, we affirm the second-stage dismissal of his postconviction petition.

¶ 45    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 46    Affirmed.